## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Alexander P. Afonso, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately eleven months, upon graduating from the DEA Academy in Quantico, Virginia in December of 2020. I received extensive training in conducting narcotics investigations, to include surveillance operations, undercover operations, management of confidential sources, and the methods currently employed by drug traffickers. After graduation, I was assigned to the New England Field Division's Task Force 5, located in Boston, Massachusetts. At the end of March 2021, I was reassigned to the New England Field Division's Cross Border Initiative (CBI) in North Andover, Massachusetts, where I am currently assigned as a Special Agent. Prior to my employment with DEA, I was employed as a Special Agent with the Diplomatic Security Service in Boston for approximately three years and subsequently as an Investigator of the Massachusetts Attorney General's Office's Medicaid Fraud Division for approximately one year. I am also a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Brunswick, Georgia, and the Diplomatic Security Service's Basic Special Agent Course in Summit Point, West Virginia, where I received additional training in conducting criminal investigations. I hold a Bachelor of Science degree from the George Washington University in Washington, DC. My current duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1).

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a criminal complaint, I have not included details about every aspect of the investigation. The dates and times cited in this affidavit are approximate.

**PURPOSE OF AFFIDAVIT**

5. This affidavit is being submitted in support of a criminal complaint against Elba Antonia PENA (hereinafter, "PENA" or the "Defendant"), charging that on November 16, 2021, she did knowingly and intentionally possess with intent to distribute and to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §841.

**Probable Cause**

6.     In 2021, a DEA undercover officer ("UC") began communicating through the online mobile application WhatsApp, including through voice phone calls and text messages, with a Dominican Republic-based drug trafficker ("Target Subject") who facilitates the distribution of fentanyl and heroin in the United States. The UC has been posing as a Massachusetts-based drug trafficker who buys and sells kilogram quantities of controlled substances, including fentanyl. During these communications, the Target Subject agreed to supply the UC with controlled substances. I know from my involvement in this investigation that the Target Subject uses couriers to deliver drugs to customers located throughout the United States, including in Massachusetts.

7.     On November 6, 2021, in a recorded phone call, the Target Subject offered to supply "one" of "the original" (meaning one kilogram of heroin) in addition to "one" (which the UC understood to mean one kilogram of fentanyl) to the UC. The UC said he would not be in the area until November 14, 2021. On November 15, 2021, in a text message, the UC asked if "regular" was "H" (meaning, heroin). The Target Subject texted, "Yes, the original" and asked the UC to call him. Shortly thereafter, in a recorded phone call, the Target Subject told the UC that he could supply the UC with "two" of the "original" on the following day, November 16, 2021. The Target Subject told the UC that he would sell the UC two kilograms of heroin on consignment, but that the UC would have to give "four" (meaning, $4,000) to a courier who would be delivering the drugs to the UC. The UC understood that the $4,000 was the transportation cost to deliver the drugs to Massachusetts. According to the Target Subject, the courier was located in Pennsylvania, would travel to New York and take a transport van to Lawrence, Massachusetts. The UC agreed to the terms.

8. Later that day, the UC received an incoming call via WhatsApp over the UC phone, which the UC had used to negotiate the drug transaction with the Target Subject. The UC did not answer the call, but later dialed the number, (267) 348-6637, that had previously called. A female, later identified as PENA answered the phone. PENA said she was calling on behalf of "Sombrero" and would be coming in a transport van and asked the UC to send her an address to meet. The UC texted her "90 Pleasant Valley St, Methuen MA" as the meet location.

9. In a subsequent recorded phone conversation, PENA told the UC that everything was ready for the following day and she was going to bringing the UC "two" and the UC would be giving her "four," which was the agreement previously reached between the UC and the Target Subject. The UC understood that PENA was going to be delivering two kilograms of heroin and paying $4,000 to PENA as the transportation fee consistent with what the Target Subject had already told the UC.

10. On November 16, 2021, at approximately 9:07 a.m. the UC contacted PENA who said the trip was going well and she would be there in about an hour. At approximately 10:43 a.m., PENA contacted the UC to let him know that she was approximately 15 minutes away. At approximately 11:36 a.m., in a text message, the UC told PENA that she should be dropped off "by where the flowers are at Home Depot" and said "that's in front of the Wendy's" and that he was "in a grey car."

11. Investigators established surveillance in the vicinity of the meeting location, a plaza located on Pleasant Valley Street in Methuen, MA. At 11:42 a.m., investigators observed PENA walking from the vicinity of a grey Ford Explorer into a Wendy's restaurant located in the plaza. PENA called the UC to say she was using the restroom at Wendy's. Shortly thereafter,

investigators saw her leaving the Wendy's restaurant.  PENA called the UC to get further information about the location of his car and was told that the UC was in a grey car to her right.

12.     PENA entered the car.  The UC nodded towards PENA's bag and asked, "Is it in there." PENA affirmed. The UC asked, " Is it two?" and PENA replied, "Yes."  PENA removed a plastic bag from her purse and handed it to the UC.  The UC quickly looked into the bag and saw what appeared to the be two balls wrapped in plastic.  The UC handed PENA $4,000 in sham currency.   PENA took the sham currency and, at that point, investigators moved in and placed her under arrest.

13.     The plastic bag supplied by PENA contained two brown plastic bags, each with six clear baggies inside it containing off-white chunks.  A field test was performed on one of the clear baggies, which tested positive for heroin.

14.     After her arrest, PENA stated that her uncle "Domingo" put her in touch with someone from the Lawrence, Massachusetts area. and she agreed to bring two kilograms of narcotics to Massachusetts in exchange for a $4,000 transportation fee.

//
//
//
//

## **CONCLUSION**

Based on the information set forth above, I believe probable cause exists to believe that Elba Antonia PENA has engaged in a violation of 21 U.S.C. §841, namely the possession with intent to distribute and the distribution of heroin, a Schedule I controlled substance.

I, Alexander P. Afonso, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.



_____
ALEXANDER P. AFONSO
DEA SPECIAL AGENT

Subscribed and sworn to me this the 16th day of November 2021.

_____
HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS